531 A.2d 1141

**Joanne DiFABIO, Appellant,**

v.

**CENTAUR INSURANCE COMPANY.**

Superior Court of Pennsylvania.

Argued June 15, 1987.

Filed Oct. 6, 1987.

Roger J. Harrington, Philadelphia, for appellant.

Margaret A. Wurzer, Philadelphia, for appellee.

Before MONTEMURO, KELLY and CERCONE, JJ.

MONTEMURO, Judge:

Appellant Joanne DiFabio challenges the entry of summary judgment in favor of appellee Centaur Insurance Company. We agree with Ms. DiFabio that the terms of the "special multi-peril" policy of insurance issued to her by Centaur obligate Centaur to cover the loss here in question. We therefore reverse the order of the Philadelphia County Court of Common Pleas and remand for the entry of partial summary judgment in favor of Ms. DiFabio.

Neither party disputes the material facts. Ms. DiFabio owns a laundromat in Croydon, Bucks County. In January of 1983, she obtained from Centaur Insurance Company a "special multi-peril" insurance policy to cover various risks

of loss to the premises where the laundromat is located. Centaur agreed in part to insure the premises against "all direct loss" caused by "WINDSTORM OR HAIL, *excluding loss caused directly or indirectly by frost or cold weather* .... whether driven by wind or not." Cross-Motion for Summary Judgment, exhibit "A" at 2 (emphasis added). The Company added that it would not cover "loss to the interior of the building(s) or the property covered therein caused ... by water from sprinkler equipment or from other piping *unless such equipment or piping be damaged as a direct result of wind or hail." Id.* (emphasis added).[1] In December of 1983, during the coverage period of the multi-peril policy, high winds blew the back doors off Ms. DiFabio's laundromat. As a result, water pipes inside the laundromat froze and burst. Although Centaur paid Ms. DiFabio for the loss of the doors, it has refused to pay for any damage to the interior of building. Ms. DiFabio therefore filed this action against Centaur to recover the withheld amounts.

On December 31, 1985, Ms. DiFabio filed a motion for partial summary judgment on the issue of liability. Centaur responded with an answer and a cross-motion for summary judgment. By order filed April 29, 1986, the

---

1. The windstorm clause of the contract provided in full as follows: "This policy insures against all direct loss to the property covered under this form caused by:

   \*   \*   \*   \*   \*   \*

   C.  WINDSTORM OR HAIL, excluding loss caused directly or indirectly by frost or cold weather, or ice (other than hail), snow or sleet, whether driven by wind or not.
   1.  This Company shall not be liable for loss to the interior of the building(s) or the property covered therein caused:
   (a) by rain, snow, sand or dust, whether driven by wind or not, unless the building(s) covered or containing the property covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail and then shall be liable for loss to the interior of the building(s) or the property covered therein as may be caused by rain, snow, sand or dust entering the building(s) through openings in the roof or walls made by direct action of wind or hail; or
   (b) by water from sprinkler equipment or from other piping, unless such equipment or piping be damaged as a direct result of wind or hail." (R–18a).
   Cross-Motion for Summary Judgment, exhibit "A" at 2.

court entered summary judgment in favor of Centaur and dismissed Ms. DiFabio's action with prejudice. This timely appeal followed.

The sole issue presented by Ms. DiFabio is whether the multi-peril policy obligates Centaur to cover the damage to the interior of the laundromat. Centaur maintains that its policy clearly excludes coverage of losses "caused directly or indirectly by frost or cold weather" and that this exclusion applies to the water-damaged interior. Ms. DiFabio, however, contends that the policy just as clearly *covers* losses caused by "water from sprinkler equipment or from other piping" when the equipment or piping is "damaged as a direct result of wind." Ms. DiFabio further contends that this language at least renders the policy ambiguous and that the court should have resolved the ambiguity in favor of the insured. We agree.

■ The rules that govern our construction of insurance contracts are familiar. As a means of fostering stability and predictability in contractual relationships, the common law has assigned to the court the task of interpreting the intent of the parties. *See Hutchinson v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986); *Standard Venetian Blind Co. v. American Empire Ins.*, 503 Pa. 300, 469 A.2d 563 (1983); *Gonzalez v. United States Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979). When the language of the contract clearly reflects the parties' intent, the court must give effect to that language. *See Hutchinson v. Sunbeam Coal Corp., supra; Standard Venetian Blind Co. v. American Empire Ins., supra; Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659 (1982). When the language is ambiguous, however, the court must resolve the ambiguity against the insurer, as drafter of the contract, and in favor of the insured, who typically lacks bargaining leverage regarding the terms of the coverage. *See Rusiski v. Pribonic*, 511 Pa. 383, 515 A.2d 507 (1986); *Standard Venetian Blind Co. v. American Empire Ins., supra; Mohn v. American Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974). Of course, this general rule of construction

does not absolve the court of its obligation to consider the circumstances from which the written instrument sprang. If extrinsic evidence will aid in the resolution of ambiguities, the court must look to it. If, moreover, the extrinsic evidence raises disputed issues of material fact, the court must refer those issues to the fact finder. *See Hutchinson v. Sunbeam Coal Corp., supra; Gonzalez v. United States Steel Corp., supra.* Only in the absence of useful extrinsic evidence will the court construe ambiguous contract language against the drafter as a matter of law. *See Hutchinson v. Sunbeam Coal Corp., supra* 513 Pa. at 202 n. 5, 519 A.2d at 391–92 n. 5; Restatement (Second) of Contracts § 206 comment a (1981).

■ The threshold determination of whether a writing is "ambiguous" necessarily lies with the court. *See Hutchinson v. Sunbeam Coal Corp., supra; Vogel v. Berkley,* 354 Pa.Super. 291, 511 A.2d 878 (1986). In making that determination, the court must assess the writing as a whole and not in discrete units. *See Musisko v. Equitable Life Ins. Co.,* 344 Pa.Super. 101, 496 A.2d 28 (1985); *Huffman v. Aetna Life and Cas. Co.,* 337 Pa.Super. 274, 486 A.2d 1330 (1984). A contract is "ambiguous" if "reasonably intelligent persons ... would differ regarding its meaning." *Musisko v. Equitable Life Ins. Co., supra* 344 Pa.Super. at 106, 496 A.2d at 31. *See also Hutchinson v. Sunbeam Coal Corp., supra; Metzger v. Clifford Realty Corp.,* 327 Pa.Super. 377, 476 A.2d 1 (1984). Thus, we will not allow an overly-subtle or technical interpretation to defeat the reasonable expectations of the insured. *See Huffman v. Aetna Life and Cas. Co., supra.* On the other hand, we will not convolute the plain meaning of a writing merely to find an ambiguity. *See Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820 (1984).

■ The multi-peril policy at issue in the present case unquestionably excludes coverage of losses caused "directly or indirectly" by cold weather. The trial court focused entirely upon this "cold weather" exclusion in deciding to grant Centaur Insurance Company's cross-motion for sum-

mary judgment. If we were to consider the exclusion in isolation, we would have to agree that Centaur clearly never intended to cover the losses caused by the frozen pipes. The court, however, overlooked the language upon which Ms. DiFabio bases her claim. That language strongly suggests that the multi-peril policy covers losses to the interior of the laundromat caused by water from pipes "damaged as a direct result of wind." The cold weather exclusion and the damaged pipe provision thus appear to conflict under the circumstances of this case. Certainly both the wind and the cold weather contributed to the loss suffered by Ms. DiFabio.

Centaur nevertheless argues that the pipes inside Ms. DiFabio's laundromat were not damaged as a *direct* result of wind. This argument assumes that the policy covers the risk of loss caused by water from interior sprinkler systems and pipes only if the damage to those interior systems and pipes results from their exposure to or contact with the violent force of high-velocity winds. We cannot agree with so narrow an interpretation of the phrase "direct result." We must give reasonable and ordinary meaning to the words of an insurance contract, unless the parties clearly intended a technical, specialized or otherwise narrow usage. The drafter of the policy, who has better reason to know of uncertainties in the policy language and who can more easily rectify those uncertainties, must either "delineate as precisely as possible the full extent of coverage or bear the consequences for failing to do so." *Techalloy Co. v. Reliance Ins. Co., supra*, 338 Pa.Superior Ct. at 7, 487 A.2d at 823. *See also Collister v. Nationwide Ins. Co.*, 479 Pa. 579, 388 A.2d 1346 (1978); Restatement (Second) of Contracts § 206 comment a. In ordinary usage, the phrase "direct result" certainly suggests immediacy of consequence, in terms of both time and space. Webster's defines the adjective "direct" as "stemming immediately from a source" and "characterized by close logical, causal or consequential relationship." Webster's Ninth New Collegiate Dictionary 358 (1986). A result, however, can follow closely or immediately from a cause even though the cause does

not itself collide with the result and even though other causes contribute to the result. In *Trexler Lumber Co. v. Allemannia Fire Ins. Co.*, 289 Pa. 13, 136 A. 856 (1927), for example, our supreme court interpreted a policy of insurance that provided coverage of windstorm loss only when "windstorm was the direct cause of the damages." The policy covered the insured's lumber sheds, which collapsed from the combined effect of high winds and accumulated snow. The court concluded that the wind was the "direct cause" of the loss even though snow accumulation, which was not a covered risk, had contributed to the collapse of the sheds. In so concluding, the court construed the phrase "direct cause" to mean "proximate cause." *Trexler Lumber Co. v. Allemannia Fire Ins. Co.*, supra, 289 Pa. at 18, 136 A.2d at 858. *See also Marks v. Lumbermen's Ins. Co.*, 160 Pa.Super. 66, 49 A.2d 855 (1946) (equating words "direct loss by windstorm" with "proximately caused by windstorm"); Anno., 65 ALR 3d 1128 (1975) (many courts have concluded that "the phrase 'direct loss' requires only that the windstorm be the proximate cause of the loss"). We need not decide in the present case whether use of such language as "direct loss" or "direct result" always requires a "proximate cause" analysis similar to that which we would use in an ordinary common-law tort action. We are satisfied that Centaur could not invoke the phrase "damaged as a direct result of wind" to limit its liability under the multi-peril policy to those rare cases in which the strength and velocity of the wind alone rends the water pipes inside the covered premises.

In the present case, the strength and velocity of the winds allowed cold air to enter an otherwise secure building. The cold air exclusion would appear to preclude coverage of any resulting loss to the interior of the building caused by the frozen pipes. The provision that addresses wind damage to interior water pipes, on the other hand, would appear to cover these losses. The circumstances of this case thus expose a latent ambiguity in the terms of the windstorm coverage. The parties, moreover, have neither pleaded facts nor offered extrinsic evidence that would aid

the court in resolving the ambiguity. We must therefore resolve the problem by construing the contract against the drafter and in favor of coverage for Ms. DiFabio.

For the above reasons, we reverse the order of the Philadelphia County Court of Common Pleas. Moreover, because the decision on the issue of liability in this case requires nothing more than application of law to undisputed fact, we remand for the entry of partial summary judgment in favor of Ms. DiFabio. The issue of damages, of course, remains unlitigated and undecided.

Order reversed; case remanded. Jurisdiction relinquished.